May it please the court, Steven Erb for the Plaintiff and Appellate Mustang Marketing. Your Honor, we're here again on exactly the same sub-provision of the PMPA 2802 C-4 that was discussed in the case that I had on behalf of Tosco a moment ago. This case… This time you should change your coat. Is that what you're saying? Almost. You know what? I don't change… I know, Your Honor. I know, Your Honor. It's good that we have all these cases on the docket the same day because now we're very familiar with the PMPA. Okay. But in all seriousness, I'm very comfortable advocating the franchisor and the franchisee position on this particular sub-provision because I think that the rule is straightforward. It comes from high faith, the Ninth Circuit decision. Hutchins in the Eleventh Circuit has commented on it. Baraka out of the First Circuit has commented on it. Baraka out of the Seventh Circuit has alluded to it indirectly. And it goes to the number one core property interest that the PMPA is all about, and that is the ability of an independent dealer to market a brand of gasoline at a particular location. And that's the relationship that the PMPA protects. And if you read the full body of case law out there, and I've been with the statute for 20 years, if there's one purpose that's protected in the case law and the legislative history, it's the protection of the franchisee against the outright theft of his business by the franchisor, by manipulation, by deception, by game playing. And I tell you, this case is all about that. And frankly, it's not the only case involving Chevron where that has been the end game. The Al-Khuri decision that Judge Tshishima sat on a couple years ago involved a situation where, just like this case, Chevron goes out, aggressively tries to purchase the dealer's business because the particular property has been labeled long-term strategic. In fact, if I were a Chevron dealer and someone told me my property was long-term strategic in the minds of Chevron, I would start dotting my I's and crossing my T's and hiring a lawyer. Because the reality is in Al-Khuri on remand, the Metabi case that was in the district court that reported a decision, this case and a number of other cases throughout California, what Chevron has been doing is targeting these prime locations, aggressively trying to buy them, often with the subtle or blatant threat of non-renewal as what happened here. And if they're unsuccessful, they'll find some legal maneuver, often engineered by their legal department and outside counsel, to get that service station and make you fight in litigation to get it back. And the Al-Khuri case involves these audits where if you don't sell to them, they go out, they do this spot audit, they find some little problem, they trump it up, and they take your business. Now, you come and fight and get it back. In this case, we deal with this ridiculous pretext about we're leaving this property, our underlying lease non-renewed, and the very next day they're trying to get the property back. And within nine days, they have an internal meeting where the vice president of marketing calls the person in Santa Ana or wherever their office, brings someone in, and this woman, McGinnis, testified that she distinctly remembered those dates. That's in the record. She distinctly remembered the dates of June 9 and 10, and she commented, because I knew I would have to remember those dates. Conveniently, nine days after Mustang had been eliminated because, quote, the lease was gone. June 9th and 10th, 2001 happens to be on a weekend. All right? So they launched this campaign to make it look as if this was like a clean break in time on May 31st, and then they come in here and they drag out these negotiations. They're constantly kind of repositioning where my guy's head is in terms of can he come in and get a lease, or can he not? Does he have a deal that they're going to pay him $850,000, which they ultimately renege on? Ultimately, they get the franchise. They drag out the negotiations for nine years. They wait up until the eve of my client's statute of limitations, and then finally they open it, probably because you can't shut down tanks for more than a year in the State of California. And they open it up. They put the banner up as a company op, and, in fact, they tell you in the record, well, we had to do this because this is an outdated facility. We have to make it state-of-the-art. It's got to have a convenience store, new canopies. We have to throw $1.3 million into it, neglecting the fact that that's not good enough reason to kick out the dealer, that you want to convert it. You don't have a PMPA right to just kick out the dealer and turn it into a company op. And lo and behold, I went to that service station last night, and nothing's changed three years later. I know that's technically outside of the record, but when I briefed this Court, I told the Court as of that point in time, nothing had changed. So I don't even know if their original so-called reason to do this, which is faulted to begin with, was ever sincere in the first place. But this case, the facts, how Judge Carter did not see this, I will never understand. Because from day one, they admit a year before nonrenewal that they're staying, and they admit there's no way they're keeping the dealer. So they basically lay a confession on the table that they're going to do an end run around the PMPA, which is what they did. Now, my guy says, all right, you're going to leave? Is that your grounds? Give me your only option, your only right to stay in possession. They said, well, it doesn't really work. He said, well, give it to me. I'll see if it works. I'll fight it out with Mace Rich. You've got to give it to me. They said, well, we'll give it to you if we don't want to use it. There's no – I mean, you're leaving. You have to give it to him. That's the option to continue. Technically, it's a right of first offer and a right of first refusal. It's a procedural defect. It's an essential condition to invoking this part of the PMPA. But more importantly, it's just blatant evidence that they're staying there. There is very little evidence anywhere that suggests they are not leaving this property. This is a great service station. 350,000 gallons a month is a great service station. Chevron never intended to leave. Chevron always intended to make it look like they were leaving, create a hiccup in possession, and then kick my guy out and open their company up. And frankly, it's not even just illegal. It's disgusting because it's all manipulative. The way they toyed around with my person, they entrusted his loyalty to the company. They beat him up into a deal for 850,000, which was well below what he wanted. Then they renege on that, that price he never wanted to pay, which is an alternative remedy. It's just incredible how this played out. At the end, you know, this notion that, well, our lease ended on May 31st, and then we didn't really come back until a year later. I don't know that that really matters because no one else ever went into possession. That property just sat vacant. They go off and they pay $129,000 in back rent, suggesting they were always a tenant. Okay? And you look at the – and they – even as far as the joint status conference, they were telling the district court that that was a – that was a compensation for some environmental liabilities. But then you look into Mace Rich's records and say, no, that's environmental liabilities. That's a joke. It's back rent. Did your client try to negotiate a lease with Mace Rich also? We tried briefly, and that's how that unfolded. Initially, my client told Mace Rich, look, if Chevron doesn't want to stay, I do. But I'm going to let them go first, and, in fact, I'm willing to sell my interest to them. And that's the way he played it at first. He never made any offers until after May 1st, 2001, so within 30 days of the non-redual date. He only did that because Chevron purportedly quit trying to buy. They want you to believe that they gave up for that last month of May. And so they said, you can go out and try to buy it. Or try to do a lease now. Well, here's the factual thing that troubles me. I don't know what to make of it. That this whole – there's – Mace Rich at some point decides, okay, I'm going to – I will go enter into negotiations with Chevron and give them the price they want. And throughout the briefs, it's like, for some reason, Mace Rich had a sudden change of position. Is there anywhere in the record why this happened? No. Did you ever – did you conclude your discovery in this case? Within what I was – yeah. I mean, we took the Mace Rich deposition. There's no testimony from Mace Rich on why they had a so-called change of partner. It's odd that there's this sudden so-called change. Yeah. I mean, if – I think the standard – the standard was wrong in the district court. I don't think I need to prove collusion. I just need to prove that the asset ended up in Chevron's hands. And every single circuit court to look at this says – it's crystal clear. You can end your underlying lease. You don't have to stick around and exercise options so long as you don't come back and open a company up or, for that matter, open with a new dealer. And yet this is exactly what Chevron premeditated from the outset and exactly what they did. Now, if you get into the facts, Your Honor, on the summary judgment standard, was there a tribal issue of fact as to collusion? And, again, I insist that it should not be an element, but I think it strengthens the case for exemplary damages. No. They didn't offer any evidence through Mace Rich. Every material point of this story that had the so-called sudden twist was contradicted at material junctures by the Mace Rich deponents when I got to them. You know, this big contentious meeting, this final offer, this giving up of hope. Ms. Paquin on Mace Rich says, I barely remember the meeting. It wasn't contentious. There's no document that says final offer. There's no giving up hope. And, in fact, two days later, Ms. Bailey in House Counsel is writing to Mace Rich and says, don't forget, we have the right of first refusal. So if Mustang or anyone else comes in offering, we expect you to honor that right of first refusal. She writes the same letter the day after Mustangs kicked out. There was no interruption in their intention to go there. Now, how much did Mace Rich play along? I don't know. I mean, you know, we talk about this collusion prior to non-renewal. That's so easy to do. You just say, we're not going to reach a deal until after the expiration date. You posture. You throw a couple terms. You know you're going to miss here and you're going to miss there. But you just don't ink the deal. So whether there was a subtle suggestion they were going to go that route, that's possible. But there's certainly odd things happening afterward. How come these negotiations just kind of blossom out of nowhere, as Your Honor mentioned? Why did they lie about the back rent? Why did they put it in the lease as a lease inducement fee for environmental liabilities? When you question, you say, no, it's back rent. Everyone knows it's back rent. I mean, there's testimony in there. When my client called Chevron people in about September, so about four or five months after this happened, they told him, you know, we're getting rent. You know, I don't – you know, it's weird. It's indicative of lack of arm's length dealings for a one-month commercial rent obligation never to have been written down anywhere. Why would Mace – I mean, my guy is still trying to get the property. And Mace Rich is not even talking to him for – with a backup offer. Three months, this property is sitting vacant. Nothing is happening to it. And they don't have a deal somewhere that says, you know, you're going to get your rent. You're not going – it's a publicly traded company. You don't just have assets sit there and not collect rent month after month. So, you know, there's all sorts of inferences that a jury or a fact finder could find in terms of material inconsistencies, weird twists in how things unfolded, things that just strain credibility, just contradictions in the record, that this whole thing was orchestrated. The extent of Mace Rich's wholehearted involvement is hard to know. They may have been toyed around. They may have helped a little bit here, maybe not as much over there. But I don't think that that matters. I think what matters is that the franchisor had a plan to misappropriate this asset and implement it and broke every single rule in terms of the procedural compliance. I mean, this notion that we offered him the chance to use the right of first refusal is absurd. I mean, you can look in the desk record on how you assign an option to extent. It's not like someday we'll give it to you if we don't want to use it ourself. So that never happened. And, again, it's not just a problem standing alone that requires reversal. It's evidence that they were never leaving. They were just trying to get rid of my client. I'm going to save my last 634. Thank you, Your Honor. Good morning, Your Honors. Michael Armstrong on behalf of Chevron Products Company. Mr. Erb's feelings for Chevron are quite clear and have been quite clear since this case began. And, unfortunately, I think it's skewed his view of this case. What's interesting to me is that throughout his initial argument, Mr. Erb did not even mention the provision of which this case falls under, the PMPA provision. I'd like to address a couple issues that need to be understood from the beginning. Number one, the record is clear. Chevron was not trying to misappropriate this dealer's franchise. In fact, the record is very clear that the only thing that Chevron wanted in this case was a modern station. The station was built in 1971. It was out of Chevron's current images. Chevron wanted a station that met its current images, a convenience store. It wasn't interested in the other. Does the station meet its current images now? It does not, Your Honor. It has not. Because of this case still pending, just like in Mr. Erb's other case, the earlier case, because we don't have finality in this case yet, Chevron has not invested the money to tear down that station and build what it wants, waiting on finality. Where is that station located? It's located where the 405 and 55 meet in Orange County. Near Southwest Plaza. It's a big mall. It's right across the street. Okay. It's right across the street. But Chevron never wanted to remove – that was never their goal here. In fact, the record is clear. Chevron recognized that, yes, this station was a – it was deemed a station that it would like to maintain the presence at, but not under the current circumstances, not under the status quo. So what it said was it recognized that Chevron could either rebuild this station or the plaintiff. In this case, the dealer could rebuild the station. And the record is clear. It attempted to even assist the dealer in negotiating its own lease. Judge Woodall, you had a question about Mace Rich's position. I'll give you my opinion on that. What the record shows is that prior to the lease termination, Mace Rich had Ms. Paquin negotiate on its behalf with Mr. Cole. And they negotiated – Mr. Cole, the record shows, made valiant efforts to try to get Ms. Paquin's attention. And there was many problems between those two. Ms. Paquin never recognized Chevron's need for a long-term lease. Ms. Paquin, just before the lease terminated, just after Mr. Cole made his final offer on behalf of Chevron, went on an unexpected maternity leave. She was replaced by a new Mace Rich. How can a maternity leave be unexpected? Well, it was four weeks earlier than she had anticipated. Oh, I see. Okay. She was replaced. I'm glad you have the maternity leave. Go on. She was replaced by Mr. Jeremy Ezra of Mace Rich. He was negotiating at that time after the termination only with Mace Rich. Chevron, again, assisted Mustang at that time in trying, in its attempts to get a lease. The record is clear about that. But my opinion was that simply Ms. Paquin looked at the situation differently than Mr. Ezra looked at the situation. He negotiated with Ms. ---- Didn't Mr. Cole also get transferred and someone else at Chevron was negotiating? That is correct, Your Honor. Mr. Cole left also right around the time this transferred. And he was replaced by Jackie McGinnis of Chevron. So you have a completely a changing of the guards, if you will. And Mr. Ezra decided, apparently, that he didn't want to enter into a lease with Mustang, the appellant here, that he preferred to have Chevron. So he invited them through a third party to rejoin the negotiations. That's what happened here. There was nothing sinister that happened. Mr. Erb uses the word probably and I don't know, and it just stinks, and all these sorts of euphemisms to what he believes are ghosts around every corner. But there's nothing in the record to support anything that he believes. Your Honor, there is. There's circumstantial evidence that Chevron had wanted possession, that Chevron did not avail the franchisee of their rights under the PNPA because Chevron is now sitting right where it wanted to be and it paid back rent. Isn't that circumstantial evidence that it never did, in reality, lose control over the property? I don't believe it is, Your Honor. I think what is circumstantial is the direct evidence states that on June 1, 2001, Chevron was off that property. That property was fenced. It remained vacant for 11 months. Chevron had no rights in that property until the new lease was signed a year later. Now, Chevron wanted a new station built out there either through Mace Rich entering through a lease with Mustang or entering through a new lease with Chevron. That was its preference, obviously. And it ended up Mace Rich changed its mind and entered up into a lease. But that doesn't, in my opinion, reflect that somehow Chevron manipulated the situation. That's just how the situation arose. Chevron on June 1 was off that property. It had no rights in that property. It certainly had no rights to give grant possession to the dealer in this case, which is the touchstone, according to the PNPA, if you lose possession and you lose the right to grant possession, which Chevron lost on June 1. And that's the basis. Isn't the question here whether it's whether Chevron really lost it? And we have to look, because your summary judgment was granted, we have to look at the evidence in the record in the most favorable light to Mustang, right? So if there's evidence in the record that gives rise to inferences that create a genuine issue of material fact, then we should probably send it back for a jury trial on this. Your Honor, the fact that Chevron entered into a lease a year later, is that what we're speaking of? Well, that Chevron, that nothing's ever changed at that station. That, you know, that there's, to me, it just seems that there's sufficient circumstantial evidence to create an issue of fact as to whether or not there was a pretext going on here or whether Chevron really lost the right to control the property. Well, Your Honor, I respectfully disagree with the notion that that infers that somehow there was a pretext. There wasn't. I think the direct evidence shows that that wasn't the case. Chevron diligently, it went to Mace Rich. It wasn't Mace Rich that came to Chevron, and it attempted to lease this property. It responded to every offer immediately. Mace Rich was the one that took four and five weeks to respond. Mace Rich eventually accepted Chevron near the terms that Chevron offered in May. But there's no evidence in this record whatsoever that somehow this was a pretext. But why not, if Chevron's walked away, why doesn't Mustang wind up with the location with a deal with Matriarch? If Matriarch wants somebody to be there, Chevron's not going to be there. Why does Mustang no longer have anything? I'm sorry. I didn't understand your question, Judge Paul. Mustang wants to stay there. Chevron wants to leave or kick Must or because they can't get another lease. Matriarch wants somebody to be there. Doing this 11 months if Chevron is not there, why isn't Mustang there? Well, Mustang actually made an offer four or five months later that they rejected. They were in negotiations with Chevron, and they wanted to stay with Chevron. But Mustang continued to try after the initial negotiations restarted with Chevron and Mace Rich. The record shows that they submitted an offer in September 2001, and Mace Rich simply rejected it. And that's their decision. And then got paid $129,000 back rent. It wasn't back rent necessarily, Your Honor. What it was was, and the record shows in Jackie McGinnis' deposition testimony, that this was a payment that Chevron agreed to pay as a lease inducement. Now, different people testified what they thought that was. Doesn't that create an issue of fact? I don't think it is, Your Honor, because that wasn't back rent. If a new lease was never entered into. No, but I'm saying on the summary judgment standard we have to say it was back rent because that's the fact that's most favorable to the non-moving party here. Right? That it was back rent? Yes, because that's evidence in the record. We're not supposed to be on summary judgment fact-finding. So we take the evidence that's in favor of the non-moving party, which in this case is Mustang. The direct evidence in the record states that it wasn't intended to be back rent. It was intended to be, Mace Rich, you're negotiating with us. There have been all these problems before the lease terminated with getting their attention, et cetera, and that Chevron is willing to pay this payment as a lease inducement. You keep negotiating with us. You keep your head into these negotiations with us. That's all that payment was inclined to. It wasn't tied necessarily to back rent because it wouldn't have had to be paid otherwise. I mean, back rent assumes that it's an obligation that Chevron is absolutely obligated to pay under the old lease, and that's not true. It wasn't obligated to pay that lease inducement fee if a new lease wasn't entered into. I suggest that, again, the evidence before this Court and in the record shows that Chevron did not intend to deprive this franchisee of its station. Chevron was not in control of this situation. It could not have compelled Mace Rich to lease the property to it. But if Chevron had really walked away and Mustang was the sole negotiator for purchase of that property at that time, then maybe Mace Rich would have had the same change of heart or had the same interest in leasing to Mustang. It's possible. It's also possible they could have turned it into a fast food restaurant or any other use that it would have desired. But the fact that they rejected Mustang more than once, I think, even when Mustang offered more money, they rejected Mustang. I think that is an indication that that may not be true. But the bottom line is that Chevron was not controlling the situation. This was Mace Rich's decision who it was going to rent to. Chevron, in good faith, attempted to negotiate a lease. It encouraged its dealer to attempt to negotiate a lease because it couldn't determine how it was going to turn out. And on May 31st, when the lease expired, and there's no doubt that that lease expired, on May 31st, 2001, Chevron left the property. It lost the right to grant possession of the property to its dealer. And under the PNPA, that's conclusive evidence that their termination was lawful. And after that, there is no relationship between Chevron and its dealer. What happens after that isn't controlled by the PNPA. Absent, certainly, evidence that there was some sort of collusion, which this record has not. There was no collusion. Why would Mace Rich want to collude with Chevron? This is a third party that operates billions of dollars worth of property. They had no reason to collude with Chevron, and the record is absent any evidence whatsoever that that happened. But after these relationships terminated, the franchise relationship, the PNPA no longer has any applicability. And Chevron and Mace Rich and Mustang are now all on equal footing. Mustang had an equal opportunity to lease this property if that's what Mace Rich wanted. The PNPA's goal of preventing discriminatory terminations and nonrenewals no longer applies. There was no unequal bargaining power after May 31st. They were on the same footing. And the mere fact that Mace Rich opted to go with Chevron instead of Mustang doesn't somehow re-invoke the PNPA. And as for the – does the Court have any questions regarding the right of first refusal? We briefed that. We did make an offer to assign that contingent, as the PNPA allows, on getting a release of liability which Chevron never received. If the Court doesn't have any other questions regarding the PNPA aspect of it, we do have a State law aspect in this case, which is whether or not the letter of intent was a binding contract. The key there is the fact that the complaint itself attaches that agreement, that letter agreement, as an attachment to the complaint, incorporates it into the complaint. It does not allege that it's in any way ambiguous. It doesn't offer any sort of interpretations. So, therefore, the standard as set forth in this case is this Court's decision in that case is the Court then just looks at the four corners of the document to see if the parties objectively intended that to be the final binding agreement. And for the reasons we stated in the brief itself, that certainly isn't the case. That was just simply an agreement to agree to some future contract which never came into fruition. All right. Thank you, counsel. Thank you, Your Honor. I would respectfully suggest that the panel give careful thought to the disposition, the mandate. The articulation of the standard, which I think should be a continuation of what every circuit court who's looked at this has done, and bearing in mind that I've also, you know, my appeal includes an appeal from the denial of my motion for partial summary judgment on the issue of PMPA liability, not damages. There would necessarily have to be a trial on damages. But any standard that either injects an element of proof for a franchisee, which, again, is ironic because we're dealing technically with an affirmative defense under the PMPA, the franchise case rests when he or she proves a nonrenewal or a termination. Everything else shifts to the defendant as an affirmative defense to show that they fell within one of the justified means for terminating or nonrenewing and followed the procedures in doing so. To establish a standard kind of by reading something out of a Senate report passage, which doesn't even use the word collusion. It talks by and says, for example, if there wasn't an arm's length relationship, that wouldn't be a valid nonrenewal. To take Senate report language and inject a new element, which seems to be falling on my client's shoulders, of proving collusion. Collusion, conspiracy, concerted action are all very difficult to prove. All I have to prove is that when they gave a notice of nonrenewal saying that the underlying lease was ending and they were moving on, they weren't. They never had an intention then or otherwise, and the proof is in the pudding because they ended up in there. And everything else is window dressing. But the legal standard should say, what was your justification? Loss of the right to give possession? And what was the net result? You're in there with a company-operated facility. The legislative history of the cases all talk about that being the most egregious violation of the Act. And we have argument here today that seems to suggest that if there was a natural termination of the underlying lease, presumably noncollusive, and maybe it's because two people can't get together to do the deal. I mean, what's the magic of May 31st? If I'm an underlying landlord, I may want to drag it out for two months to get a better deal. The point is Chevron wants to market fuel there. Who cares about how their transaction goes down? For Chevron to argue that all my client's rights, all the franchisee's rights evaporate on May 31st because of some technical end of his franchise term, and on June 1st, they're free to do whatever they want with that property, just invites all sorts of abuses. That is so easy for a franchisor to do. And then to add an element of collusion complicates the cost for the franchisee. These are wars of attrition. That's why they go out and they audit these poor guys and they terminate them. They bring debt relief actions. I mean, there's a dozen of them or more in the different district courts. These guys got to prove that they got all their books in order and they reported their sales tax to the T. The Metabi case, the poor guy overpaid his sales tax and they terminated him because they did an audit and they said, well, that's material. And the district court rejected that following this court's opinion in Elkhury. That's not material to you. That's a pretext for stealing businesses. So the standard has to be cut and dry. You know, if you're a franchisor, you're either leaving or you're staying. If you're staying, if the negotiations drag out for another week, another month, just suspend the effectiveness of the nonrenewal. If you stay in there, you reinstate the franchise. It's absurd to argue that the PMPA leaves the franchisee high and dry once the relationship ends. The cases talk about reinstating franchisees after destruction of the property. They talk about the Hutchins case. We've read the cases. Okay. I'm sorry. Just one. I'm sorry. You've made the point. Okay. Do you have another point? The contract count. Okay. It's the whole difference. Okay. Again, that's a separate remedy. I mean, it's difficult to represent a client and not bring an action on an $850,000 contract. And I contend that the only evidence Chevron has introduced beyond the face of the But there's no evidence they told my individual, my client, that this wasn't binding. Everything they did led him to believe when he signed on the dotted line, if they came in and said give us your business, here's your $850,000, he was stuck. And so it's the objective manifestation of assent. It's the course of conduct. It's how the document reads. It doesn't clearly say this document's nonbinding, period. It says no one's bound until the conditions are satisfied, which is how you would do any conditional contract obligation. You don't have to sell your house until I get my fine or you get your financing. You're not bound until you get conditions satisfied. There's four conditions. Two of them are satisfied. They got their new lease 20 years from Mace Rich. They got their permits to rebuild, which they haven't done anything with. They never took it anywhere for, quote, management approval, which seems to be just a little game they can play with later if they want to. And the man who wrote the letter said he had authority to write the letter. And the only last condition was for him to sign this formal PMPA mutual termination agreement, which everyone admitted was a form in which they never gave to my client to sign, and which they never produced in discovery, so that I could point out to the court, this is a form. You fill in the blanks. You sign off. Because, again, 20 years into practice, I know what it looks like. That was just the deal is the letter agreement, May 22nd. The other stuff is just formalities, and the cases are clear that the obligation can be formed earlier in time. Thank you very much. Thank you, counsel. This session of court is adjourned.
judges: Tashima, Wardlaw, Collins